(Slip Opinion)        OCTOBER TERM, 2005        1

NOTE: Where it is feasible, a syllabus (headnote) will be released, as is being done in connection with this case, at the time the opinion is issued. The syllabus constitutes no part of the opinion of the Court but has been prepared by the Reporter of Decisions for the convenience of the reader. See *United States* v. *Detroit Timber & Lumber Co.,* 200 U. S. 321, 337.

# SUPREME COURT OF THE UNITED STATES

Syllabus

## HOWARD DELIVERY SERVICE, INC., ET AL. *v.* ZURICH AMERICAN INSURANCE CO.

### CERTIORARI TO THE UNITED STATES COURT OF APPEALS FOR THE FOURTH CIRCUIT

No. 05–128.    Argued March 21, 2006—Decided June 15, 2006

The Bankruptcy Code accords priorities, among unsecured creditors' claims, for unpaid "wages, salaries, or commissions," 11 U. S. C. §507(a)(4), and for unpaid contributions to "an employee benefit plan," §507(a)(5). Petitioner Howard Delivery Service, Inc. (Howard), was required by each State in which it operated to maintain workers' compensation coverage to secure its employees' receipt of health, disability, and death benefits in the event of on-the-job accidents. Howard contracted with respondent Zurich American Insurance Co. (Zurich) to provide this insurance for Howard's operations in ten States. After Howard filed a Chapter 11 bankruptcy petition, Zurich filed an unsecured creditor's claim for some $400,000 in premiums, asserting that they qualified as "contributions to an employee benefit plan" entitled to priority under §507(a)(5). The Bankruptcy Court denied priority status to the claim, reasoning that because overdue premiums do not qualify as bargained-for benefits furnished in lieu of increased wages, they fall outside §507(a)(5)'s compass. The District Court affirmed, similarly determining that unpaid workers' compensation premiums do not share the priority provided for unpaid contributions to employee pension and health plans. A Fourth Circuit panel reversed without agreeing on a rationale.

*Held:* Insurance carriers' claims for unpaid workers' compensation premiums owed by an employer fall outside the priority allowed by §507(a)(5). Although the question is close, such premiums are more appropriately bracketed with liability insurance premiums for, *e.g.*, motor vehicle, fire, or theft insurance, than with contributions made for fringe benefits that complete a pay package, *e.g.,* pension plans and group health, life, and disability insurance, which undisputedly

2          HOWARD DELIVERY SERVICE, INC. *v.*
            ZURICH AMERICAN INS. CO.

Syllabus

are covered by §507(a)(5).

*United States* v. *Embassy Restaurant, Inc.,* 359 U. S. 29, 29–35, and *Joint Industry Bd. of Elec. Industry* v. *United States,* 391 U. S. 224, 228–229, held that an employer's unpaid contributions to collectively-bargained plans providing, respectively, life insurance and annuity benefits to employees did not qualify as "wages" entitled to priority status under the prior bankruptcy law. Congress thereafter enacted what is now §507(a)(5) in order to provide a priority for the kind of fringe benefits at issue in those cases. Notably, Congress did not enlarge the "wages, salaries, [and] commissions" priority, §507(a)(4), to include fringe benefits, but instead created a new priority, §507(a)(5), one step lower than the wage priority. The new provision allows a plan provider to recover unpaid premiums—albeit only after the employees' claims for "wages, salaries, or commissions" have been paid. The current Code's juxtaposition of the wages and employee benefit plan priorities manifests Congress' comprehension that fringe benefits generally complement, or substitute for, hourly pay. Congress tightened the linkage of §507(a)(4) and (a)(5) by imposing a combined cap on the two priorities, currently set at $10,000 per employee. See §507(a)(5)(B). Because §507(a)(4) has a higher priority status, all claims for wages are paid first, up to the $10,000 limit; claims under §507(a)(5) for benefit plan contributions can be recovered next up to the remainder of the $10,000 ceiling. No other §507 subsections are so joined together.

Apart from the clues provided by *Embassy Restaurant, Joint Industry Bd.,* and the textual ties binding §507(a)(4) and (5), Congress left undefined the §507(a)(5) terms, "*contributions* to an *employee benefit plan* . . . arising from *services rendered.*" (Emphases added.) Maintaining that §507(a)(5) covers more than wage substitutes like the ones at issue in *Embassy Restaurant* and *Joint Industry Bd.,* Zurich urges the Court to borrow the encompassing definition of employee benefit plan contained in the Employee Retirement Income Security Act of 1974 (ERISA): "[A]ny plan, fund, or program [that provides] its participants . . . , through the purchase of insurance or otherwise, . . . benefits in the event of sickness, accident, disability, [or] death." 29 U. S. C. §1002(1). Federal courts have questioned whether ERISA is appropriately used to fill in blanks in a Bankruptcy Code provision, and the panel below parted ways on this issue. In any event, ERISA's signals are mixed, for §1003(b)(3) specifically exempts from ERISA's coverage the genre of plan here at issue, *i.e.*, one "maintained solely for the purpose of complying with applicable work[ers'] compensation laws." That exemption strengthens the Court's resistance to Zurich's argument. Rather, the Court follows *United States* v. *Reorganized CF&I Fabricators of Utah, Inc.,* 518 U. S.

213, 219, in noting that "[h]ere and there in the Bankruptcy Code Congress has included specific directions that establish the significance for bankruptcy law of a term used elsewhere in the federal statutes." *Id.,* at 219–220. No such directions are contained in §507(a)(5), and the Court has no warrant to write them into the text.

This case turns instead on the essential character of workers' compensation regimes. Unlike pension plans or group life, health, and disability insurance—negotiated or granted to supplement, or substitute for, *wages*—workers' compensation prescriptions modify, or substitute for, the common-law tort *liability* to which employers were exposed for work-related *accidents*. Workers' compensation regimes provide something for employees, assuring limited fixed payments for on-the-job injuries, and something for employers, removing the risk of large judgments and heavy costs in tort litigation. No such trade-off is involved in employer-sponsored fringe benefit plans. Moreover, employer-sponsored pension and health plans characteristically insure the employee (or his survivor) only. In contrast, workers' compensation insurance shields the insured enterprise. When an employer fails to secure workers' compensation coverage, or loses coverage for nonpayment of premiums, an affected employee's remedy would not lie in a suit for premiums that should have been paid to a compensation carrier. Instead, employees who sustain work-related injuries commonly have recourse to a state-maintained fund or are authorized by state law to pursue the larger recoveries successful tort litigation ordinarily yields. Further distancing workers' compensation and fringe benefits, nearly all States require employers to participate in workers' compensation, with substantial penalties, even criminal liability, for failure to do so. It is relevant, although not dispositive, that States overwhelmingly prescribe and regulate insurance coverage for on-the-job accidents, while commonly leaving fringe benefits to private ordering.

Zurich's argument that according its claim a §507(a)(5) priority will give workers' compensation carriers an incentive to continue coverage of a failing enterprise, thus promoting rehabilitation of the business, is unpersuasive. Rather than speculating on how such insurers might react were they to be granted a §507(a)(5) priority, the Court is guided by the Bankruptcy Code's objective of securing equal distribution among creditors, see, *e.g., Kothe* v. *R. C. Taylor Trust,* 280 U. S. 224, 227, and by the corollary principle that preference provisions must be tightly construed, see, *e.g., id.,* at 227. Cases like Zurich's are illustrative. The Bankruptcy Code caps the amount recoverable for contributions to employee benefit plans. Opening the §507(a)(5) priority to workers' compensation carriers could shrink the amount available to cover unpaid contributions to plans paradigmatically qualifying as wage

surrogates, primarily pension and health benefit plans.  Pp. 5–16.

403 F. 3d 228, reversed and remanded.

GINSBURG, J., delivered the opinion of the Court, in which ROBERTS, C. J., and STEVENS, SCALIA, THOMAS, and BREYER, JJ., joined.  KENNEDY, J., filed a dissenting opinion, in which SOUTER and ALITO, JJ., joined.

NOTICE: This opinion is subject to formal revision before publication in the preliminary print of the United States Reports. Readers are requested to notify the Reporter of Decisions, Supreme Court of the United States, Washington, D. C. 20543, of any typographical or other formal errors, in order that corrections may be made before the preliminary print goes to press.

# SUPREME COURT OF THE UNITED STATES

———————

No. 05–128

———————

## HOWARD DELIVERY SERVICE, INC., ET AL., PETITIONERS *v.* ZURICH AMERICAN INSURANCE CO.

### ON WRIT OF CERTIORARI TO THE UNITED STATES COURT OF APPEALS FOR THE FOURTH CIRCUIT

[June 15, 2006]

JUSTICE GINSBURG delivered the opinion of the Court.

The Bankruptcy Code accords a priority, among unsecured creditors' claims, for unpaid "wages, salaries, or commissions," 11 U. S. C. A. §507(a)(4)(A) (Supp. 2006), and for unpaid contributions to "an employee benefit plan," §507(a)(5).[1] It is uncontested here that §507(a)(5) covers fringe benefits that complete a pay package—typically pension plans, and group health, life, and disabil-

———————

[1] All references to provisions of the Bankruptcy Code use the current numbering. At the time respondent Zurich American Insurance Company (Zurich) claimed priority treatment for unpaid workers' compensation premiums, the relevant subsections were numbered (a)(3) (wages) and (a)(4) (employee benefit plans). The Bankruptcy Abuse Prevention and Consumer Protection Act of 2005, Pub. L. 109–8, §212(2), 119 Stat. 51, altered the priority list so that (a)(3) became (a)(4), and (a)(4) became (a)(5). The only other statutory change relevant here concerns the dollar amount accorded priority status under current §507(a)(4) and (a)(5). When Zurich filed its proof of claim, the total sum allowed under those two subsections was $4,650 for each employee, see note following 11 U. S. C. §104 (2000 ed., Supp. III). That ceiling has since been raised, pursuant to §104, to $10,000 per employee, 11 U. S. C. A. §507(a)(5)(B)(i) (Supp. 2006).

2 HOWARD DELIVERY SERVICE, INC. *v.*
ZURICH AMERICAN INS. CO.

Opinion of the Court

ity insurance—whether unilaterally provided by an employer or the result of collective bargaining. This case presents the question whether the §507(a)(5) priority also encompasses claims for unpaid premiums on a policy purchased by an employer to cover its workers' compensation liability. We hold that premiums owed by an employer to a workers' compensation carrier do not fit within §507(a)(5).

Workers' compensation laws assure that workers will be compensated for work-related injuries whether or not negligence of the employer contributed to the injury. To that extent, arrangements for the payment of compensation awards might be typed "employee benefit plan[s]." On the other hand, statutorily prescribed workers' compensation regimes do not run exclusively to the employees' benefit. In this regard, they differ from privately ordered, employer-funded pension and welfare plans that, together with wages, remunerate employees for services rendered. Employers, too, gain from workers' compensation prescriptions. In exchange for no-fault liability, employers gain immunity from tort actions that might yield damages many times higher than awards payable under workers' compensation schedules. Although the question is close, we conclude that premiums paid for workers' compensation insurance are more appropriately bracketed with premiums paid for other liability insurance, *e.g.*, motor vehicle, fire, or theft insurance, than with contributions made to secure employee retirement, health, and disability benefits.

In holding that claims for workers' compensation insurance premiums do not qualify for §507(a)(5) priority, we are mindful that the Bankruptcy Code aims, in the main, to secure equal distribution among creditors. See *Kothe* v. *R. C. Taylor Trust,* 280 U. S. 224, 227 (1930); *Kuehner* v. *Irving Trust Co.,* 299 U. S. 445, 451 (1937). We take into account, as well, the complementary principle that prefer-

ential treatment of a class of creditors is in order only when clearly authorized by Congress. See *Nathanson* v. *NLRB,* 344 U. S. 25, 29 (1952); *United States* v. *Embassy Restaurant, Inc.,* 359 U. S. 29, 31 (1959).

I

Petitioner Howard Delivery Service, Inc. (Howard), for many years owned and operated a freight trucking business. Howard employed as many as 480 workers and operated in about a dozen States. Each of those States required Howard to maintain workers' compensation coverage to secure its employees' receipt of health, disability, and death benefits in the event of on-the-job accidents. Howard contracted with Zurich to provide this insurance for Howard's operations in ten States.

On January 30, 2002, Howard filed a Chapter 11 bankruptcy petition. Zurich filed an unsecured creditor's claim in that proceeding, seeking priority status for some $400,000 in unpaid workers' compensation premiums. In an amended proof of claim, Zurich asserted that these unpaid premiums qualified as "[c]ontributions to an employee benefit plan" entitled to priority under §507(a)(5). App. 32a.[2] The Bankruptcy Court denied priority status to Zurich's claim, reasoning that the overdue premiums do not qualify as bargained-for benefits furnished in lieu of increased wages, hence they fall outside §507(a)(5)'s compass. App. to Pet. for Cert. 51a–57a. The District Court affirmed, similarly determining that unpaid workers' compensation premiums do not share the priority provided for unpaid contributions to employee pension and health

_____

[2] In its initial proof of claim, Zurich did not check the box marked "Contributions to an employee benefit plan," but instead checked a box marked "Other," and wrote in "Administrative Expense—Insurance Premiums." App. 22a, 30a. Zurich does not argue here that the workers' compensation premiums owed by Howard qualify as administrative expenses entitled to priority under §507(a)(2).

plans. *Id.,* at 39a–50a.

The Court of Appeals for the Fourth Circuit reversed 2 to 1 in a *per curiam* opinion. 403 F. 3d 228 (2005). The judges in the majority, however, disagreed on the rationale. Judge King concluded that §507(a)(5) unambiguously accorded priority status to claims for unpaid workers' compensation premiums. *Id.,* at 237. Judge Shedd, concurring in the judgment, found the §507(a)(5) phrase "employee benefit plan" ambiguous. Looking to legislative history, he concluded that Congress likely intended to give past due workers' compensation premiums priority status. *Id.,* at 238–239. In dissent, Judge Niemeyer, like Judge King, relied on the "plain meaning" of §507(a)(5), but read the provision unequivocally to deny priority status to an insurer's claim for unpaid workers' compensation premiums. *Id.,* at 241–244.

We granted certiorari, 546 U. S. ___ (2005), to resolve a split among the Circuits concerning the priority status of premiums owed by a bankrupt employer to a workers' compensation carrier. Compare *In re Birmingham-Nashville Express, Inc.*, 224 F. 3d 511, 517 (CA6 2000) (denying priority status to unpaid workers' compensation premiums), *In re Southern Star Foods, Inc.*, 144 F. 3d 712, 717 (CA10 1998) (same), and *In re HLM Corp.*, 62 F. 3d 224, 226–227 (CA8 1995) (same), with *Employers Ins. of Wausau* v. *Plaid Pantries, Inc.*, 10 F. 3d 605, 607 (CA9 1993) (according priority status), and 403 F. 3d, at 229 (case below) (same).[3]

--------

[3] We have jurisdiction of this case, as did the Court of Appeals, because the District Court's ruling qualifies as a final decision under 28 U. S. C. §158(d). See 403 F. 3d, at 231, and n. 6 (District Court's ruling effectively concluded the dispute between Zurich and Howard, for the adverse decision rendered Zurich's claim valueless and Zurich agreed to withdraw the claim if it failed to prevail on appeal). See also *In re Saco Local Development Corp.*, 711 F. 2d 441, 444 (CA1 1983) (majority opinion of Breyer, J.) ("Congress has long provided that orders in bankruptcy cases may be immediately appealed if they finally dispose of *discrete disputes within the larger case*—and in particular, it has long

## II

Adjoining subsections of the Bankruptcy Code, §507(a)(4) and (5), are centrally involved in this case. Subsections 507(a)(4) and (5) currently provide:

> "(a) The following expenses and claims have priority in the following order:
>
> .        .        .        .        .
>
> "(4) Fourth, allowed unsecured claims . . . for—
>
> "(A) wages, salaries, or commissions, including vacation, severance, and sick leave pay earned by an individual . . . .
>
> .        .        .        .        .
>
> "(5) Fifth, allowed unsecured claims for contributions to an employee benefit plan—
>
> "(A) arising from services rendered within 180 days before the date of the filing of the [bankruptcy] petition or the date of the cessation of the debtor's business, whichever occurs first . . . ." 11 U. S. C. A. §507 (Supp. 2006).

Two decisions of this Court, *United States* v. *Embassy Restaurant, Inc.,* 359 U. S. 29 (1959), and *Joint Industry Bd. of Elec. Industry* v. *United States,* 391 U. S. 224 (1968), prompted the enactment of §507(a)(5). *Embassy Restaurant* concerned a provision of the 1898 Bankruptcy Act that granted priority status to "wages" but said nothing of "employee benefits plans" or anything similar. 11 U. S. C. §104(a)(2) (1952 ed., Supp. V; repealed 1978). We held that a debtor's unpaid contributions to a union welfare plan—which provided life insurance, weekly sick benefits, hospital and surgical benefits, and other advantages—did not qualify within the priority for unpaid "wages." 359 U. S., at 29–35. In *Joint Industry Bd.*, we

---

provided that orders finally settling creditors' claims are separately appealable.").

6          HOWARD DELIVERY SERVICE, INC. *v.*
              ZURICH AMERICAN INS. CO.

                   Opinion of the Court

followed *Embassy Restaurant* and held that an employer's bargained-for contributions to an employees' annuity plan did not qualify as "wages" entitled to priority status.  391 U. S*.,* at 228–229.

To provide a priority for fringe benefits of the kind at issue in *Embassy Restaurant* and *Joint Industry Bd.*, Congress added what is now §507(a)(5) when it amended the Bankruptcy Act in 1978.  See H. R. Rep. No. 95–595, p. 187 (1977) (hereinafter H. R. Rep.) (explaining that the amendment covers "health insurance programs, life insurance plans, pension funds, and all other forms of employee compensation that [are] not in the form of wages"); S. Rep. No. 95–989, p. 69 (1978).  Notably, Congress did not enlarge the "wages, salaries, [and] commissions" priority, §507(a)(4), to include fringe benefits.  Instead, Congress created a new priority for such benefits, one step lower than the wage priority.  The new provision, currently contained in §507(a)(5), allows the provider of an employee benefit plan to recover unpaid premiums—albeit only after the employees' claims for "wages, salaries, or commissions" have been paid.  §507(a)(4).

Beyond genuine debate, the main office of §507(a)(5) is to capture portions of employee compensation for services rendered not covered by §507(a)(4).  Cf. *Embassy Restaurant,* 359 U. S., at 35; *Joint Industry Bd.,* 391 U. S., at 228–229 (both emphasizing Congress' prerogative in this regard).  The current Code's juxtaposition of the wages and employee benefit plan priorities manifests Congress' comprehension that fringe benefits generally complement, or "substitute" for, hourly pay.  See H. R. Rep., at 357 (noting "the realities of labor contract negotiations, under which wage demands are often reduced if adequate fringe benefits are substituted"); *id.,* at 187 ("[T]o ignore the reality of collective bargaining that often trades wage dollars for fringe benefits does a severe disservice to those working for a failing enterprise."); *In re Saco Local Development Corp.,*

711 F. 2d 441, 449 (CA1 1983) (majority opinion of Breyer, J.) (substitution of fringe benefits for wages "can normally be assumed, unless the employer is a philanthropist").

Congress tightened the linkage of (a)(4) and (a)(5) by imposing a combined cap on the two priorities, currently set at $10,000 per employee. See §507(a)(5)(B).[4] Because (a)(4) has a higher priority status, all claims for wages are paid first, up to the $10,000 limit; claims under (a)(5) for contributions to employee benefit plans can be recovered next up to the remainder of the $10,000 ceiling. No other subsections of §507 are joined together by a common cap in this way.

Putting aside the clues provided by *Embassy Restaurant*, *Joint Industry Bd.*, and the textual ties binding §507(a)(4) and (5), we recognize that Congress left undefined the §507(a)(5) terms: "*contributions* to an *employee benefit plan* . . . arising from *services rendered* within 180 days before the date of the filing of the [bankruptcy] petition." (Emphases added.) Maintaining that subsection (a)(5) covers more than wage substitutes of the kind at issue in *Embassy Restaurant* and *Joint Industry Bd.*, Zurich urges the Court to borrow the encompassing definition of employee benefit plan contained in the Employee

_____

[4] Section 507(a)(5)(B) provides:
 "(a) The following expenses and claims have priority in the following order:
.          .          .          .          .
 "(5) Fifth, allowed unsecured claims for contributions to an employee benefit plan—
.          .          .          .          .
 "(B) for each such plan, to the extent of—
 "(i) the number of employees covered by each such plan multiplied by $10,000; less
 "(ii) the aggregate amount paid to such employees under paragraph (4) of this subsection, plus the aggregate amount paid by the estate on behalf of such employees to any other employee benefit plan." 11 U. S. C. A. §507 (Supp. 2006).

Retirement Income Security Act of 1974 (ERISA), 88 Stat. 829, as amended, 29 U. S. C. §1001 *et seq.* (2000 ed. and Supp. III). See §1002(1) (term "employee welfare benefit plan" means, *inter alia*, "any plan, fund, or program [that provides] its participants or their beneficiaries, through the purchase of insurance or otherwise, . . . benefits in the event of sickness, accident, disability, death or unemployment"); §1002(3) (term "employee benefit plan . . . means an employee welfare benefit plan or an employee pension benefit plan or a plan which is both an employee welfare benefit plan and an employee pension benefit plan"); cf. §1003(b)(3) (excluding plans "maintained solely for the purpose of complying with applicable work[ers'] compensation laws or unemployment compensation or disability insurance laws"). The dissent endorses this borrowing. See *post*, at 8–9.

Federal courts have questioned whether ERISA is appropriately used to fill in blanks in a Bankruptcy Code provision, and the panel below parted ways on this issue. See 403 F. 3d, at 235, n. 9 (King, J., concurring in judgment) ("declin[ing] to rely upon the ERISA definition"); *id.,* at 239–241 (Shedd, J., concurring in judgment) (reading legislative history to indicate that Congress intended "'employee benefit plan' in the bankruptcy priority provision to have the same meaning that [the term] has in ERISA"); *id.,* at 245 (Niemeyer, J., dissenting) (maintaining that ERISA definition is inapt in Bankruptcy Code priority context); cf. *Birmingham-Nashville Express,* 224 F. 3d, at 516–517 (noting division of opinion but concluding that decisions rejecting incorporation of ERISA's "employee benefit plan" definition into §507(a)(5) "ha[ve] the better of the argument"); *HLM Corp.,* 62 F. 3d, at 226 ("[T]he ERISA definition and associated court guidelines were designed to effectuate the purpose of ERISA, not the Bankruptcy Code." (internal quotation marks omitted)); *Southern Star Foods*, 144 F. 3d, at 714 (same). Compare Brief for American

Home Assurance Company et al. as *Amici Curiae* 17–25 (legislative history suggests Congress intended to incorporate ERISA definition), with Brief for National Coordinating Committee for Multiemployer Plans as *Amicus Curiae* 22–27, and n. 21 (legislative history suggests Congress did not intend to incorporate ERISA definition).

ERISA's omnibus definition does show, at least, that the term "employee welfare benefit plan" is susceptible of a construction that would include workers' compensation plans. That Act's signals are mixed, however, for 29 U. S. C. §1003(b)(3) specifically exempts from ERISA's coverage the genre of plan here at issue, *i.e.*, one "maintained solely for the purpose of complying with applicable work[ers'] compensation laws."[5] The §1003(b)(3) exemption strengthens our resistance to Zurich's argument. We follow the lead of an earlier decision, *United States* v. *Reorganized CF&I Fabricators of Utah, Inc.,* 518 U. S. 213, 219 (1996), in noting that "[h]ere and there in the Bankruptcy Code Congress has included specific directions that establish the significance for bankruptcy law of a term used elsewhere in the federal statutes." *Id.,* at 219–220. No such directions are contained in §507(a)(5), and we have no warrant to write them into the text.

This case turns, we hold, not on a definition borrowed from a statute designed without bankruptcy in mind, but on the essential character of workers' compensation regimes. Unlike pension provisions or group life, health, and disability insurance plans—negotiated or granted as pay supplements or substitutes—workers' compensation

---

[5] Congress also excluded most workers' compensation benefits from the purview of the Davis-Bacon Act, 40 U. S. C. §3141(2) (2000 ed., Supp. III), a measure that fixes a floor under wages on Government projects. The Davis-Bacon Act incorporates "bona fide fringe benefits," broadly defined, into prevailing wage determinations, but specifically excludes benefits contractors are required to provide under federal, state, or local law. §3141(2)(B).

prescriptions have a dominant employer-oriented thrust:
They modify, or substitute for, the common-law tort liabil-
ity to which employers were exposed for work-related acci-
dents. See 6 A. Larson & L. Larson, Workers' Compensa-
tion Law §100.01[1], pp. 100–2 to 100–3 (2005) (hereinafter
Larson & Larson); 4 J. Lee & B. Lindahl, Modern Tort Law:
Liability and Litigation §43:25, pp. 43–45 to 43–46 (2d ed.
2003). As typically explained:

> "The invention of workers compensation as it has
> existed in this country since about 1910 involves a
> classic social trade-off or, to use a Latin term, a *quid
> pro quo. . . .* What is given to the injured employee is
> the right to receive certain limited benefits regardless
> of fault, that is, even in cases in which the employee is
> partially or entirely at fault, or when there is no fault
> on anyone's part. What is taken away is the em-
> ployee's right to recover full tort damages, including
> damages for pain and suffering, in cases in which there
> is fault on the employer's part." P. Lencsis, Workers
> Compensation: A Reference and Guide 9 (1998) (here-
> inafter Lencsis).

Workers' compensation regimes thus provide something
for employees—they assure limited fixed payments for on-
the-job injuries—and something for employers—they
remove the risk of large judgments and heavy costs gener-
ated by tort litigation. See 6 Larson & Larson §100.03[1],
at 100–11 ("[Workers' compensation] relieves the employer
not only of common-law tort liability, but also of statutory
liability under virtually all state statutes, as well as of
liability in contract and in admiralty, for an injury covered
by the compensation act." (footnote omitted)); Lubove,
Workmen's Compensation and the Prerogatives of Volun-
tarism, 8 Lab. Hist. 254, 258–262 (Fall 1967) (workers'
compensation programs were adopted by nearly every
State in large part because employers anticipated signifi-

cant benefits from the programs; other programs workers' groups sought to make mandatory—notably, health insurance—were not similarly embraced). No such tradeoff is involved in fringe benefit plans that augment each covered worker's hourly pay.[6]

Employer-sponsored pension plans, and group health or life insurance plans, characteristically insure the employee (or his survivor) only. In contrast, workers' compensation insurance, in common with other liability insurance in this regard, *e.g.,* fire, theft, and motor vehicle insurance, shield the insured enterprise: Workers' compensation policies both protect the employer-policyholder from liability in tort, and cover its obligation to pay workers' compensation benefits. See *In re HLM Corp.*, 165 B. R. 38, 41 (Bkrtcy. Ct. Minn. 1994). When an employer fails to secure workers' compensation coverage, or loses coverage for nonpayment of premiums, an affected employee's remedy would not lie in a suit for premiums that should have been paid to a compensation carrier. Instead, employees who sustain work-related injuries would commonly have recourse to a state-maintained fund. See, *e.g.,* Minn. Stat. §176.183, subd. 1 (2004); N. Y. Work. Comp. Law Ann. §26–a (West Supp. 2006). Or, in lieu of the limited benefits obtainable from a state fund under workers' compensation schedules, the injured employee might

---

[6] Providing health care to workers fosters a healthy and happy workforce, and a contented workforce benefits employers. The dissent suggests this as a reason to rank workers' compensation insurance with health and pension plans for bankruptcy priority purposes. See *post,* at 5. But the benefit employers gain from providing health and pension plans for their employees is of a secondary order; indeed, under the dissent's logic, wages could be said to "benefit" the employer because they ensure that employees come to work, can afford transportation to the job site, etc. These benefits redound to the employer reflexively, as a consequence of the benefit to the employee. Workers' compensation insurance, by contrast, directly benefits insured employers by eliminating their tort liability for workplace accidents.

be authorized to pursue the larger recoveries successful
tort litigation ordinarily yields.  See, *e.g., id.*, §11 (West
2005); W. Va. Code §23–2–8 (Lexis 2005); Lencsis 67.

Further distancing workers' compensation arrangements
from bargained-for or voluntarily accorded fringe benefits,
nearly all States, with limited exceptions, require employ-
ers to participate in their workers' compensation systems.
See, *e.g.,* Ill. Comp. Stat., ch. 820, §305/4 (West 2004);
Minn. Stat. §176.181, subd. 2 (2004); U. S. Dept. of Labor,
Office of Workers' Compensation, State Workers' Compen-
sation Laws, Table 1: Type of Law and Insurance Re-
quirements for Private Employment (2005), available at
http://www.dol.gov/esa/regs/statutes/owcp/stwclaw/tables-pdf/
table1.pdf (as visited June 13, 2006, and available in Clerk
of Court's case file).  An employer who fails to secure the
mandatory coverage is subject to substantial penalties, even
criminal liability.  We do not suggest, as the dissent hy-
pothesizes, see *post*, at 6–7, that a compensation carrier
would gain §507(a)(5) priority for unpaid premiums in States
where workers' compensation coverage is elective.  Nor do we
suggest that wage surrogates or supplements, *e.g.,* pension
and health benefits plans, would lose protection under
§507(a)(5) if a State were to mandate them.  We simply
count it a factor relevant to our assessment that States
overwhelmingly prescribe and regulate insurance coverage
for on-the-job accidents, while commonly leaving pension,
health, and life insurance plans to private ordering.[7]

_____

[7] *Saco Local Development Corp.*, 711 F. 2d, at 448–449, we note, is not
at odds with our conclusion that unpaid workers' compensation premi-
ums do not qualify for priority status.  The First Circuit held in *Saco*
that a group life, health, and disability insurance plan fit within
§507(a)(5), though the benefit package was unilaterally provided by the
employer, and not installed pursuant to collective bargaining.  Wage
surrogates, then-Judge Breyer explained, need not be negotiated to
qualify under §507(a)(5) as "employee benefit plans," for "Congress'
object in enacting [that subsection] was to extend the 1898 Act's wage
priority to new forms of compensation, such as insurance and other

We note that when the Fourth Circuit confronted a claim for workers' compensation premiums owed not to a private insurer but to a state fund, that court ranked the premiums as "excise taxes" qualifying for bankruptcy priority under what is now §507(a)(8)(E). See *New Neighborhoods, Inc.* v. *West Virginia Workers' Comp. Fund*, 886 F. 2d 714, 718–720 (1989).[8] See also *In re Suburban Motor Freight, Inc.*, 998 F. 2d 338, 342 (CA6 1993) ("Where a State 'compel[s] the payment' of 'involuntary exactions, regardless of name,' and where such payment is universally applicable to similarly situated persons or firms, these payments are taxes for bankruptcy purposes." (quoting *New Neighborhoods*, 886 F. 2d, at 718–719 (alteration and citations omitted in original))); LeRoy et al., Workers' Compensation in Bankruptcy: How Do the Parties Fare? 24 Tort & Ins. L. J. 593, 623–624 (1989) (describing disagreement among courts on whether payments to state-run workers' compensation funds qualify as excise taxes under §507(a)(8)). We express no view on the §507(a)(8)(E) issue presented in *New Neighborhoods*. We venture only this observation: It is common for Congress to prefer Government creditors over private creditors, see *Birmingham-Nashville Express*, 224 F. 3d, at 517–518; it would be anomalous, however, to advance Zurich's claim to level (a)(5) while leaving state-fund creditors at level (a)(8).

Zurich argues that according its claim an (a)(5) priority will give workers' compensation carriers an incentive to

_____

fringe benefits." *Id.*, at 449. *Saco* did not involve workers' compensation regimes, and the First Circuit expressed no opinion on them.

[8]The state fund in *New Neighborhoods*, it appears, did not urge that claims for unpaid workers' compensation premiums qualify for the higher (a)(5) priority. The Fourth Circuit's opinion in that case, however, suggests that the court assumed a private compensation carrier would be accorded no priority. See 886 F. 2d, at 720 (under court's holding, "a state agency is given, as an insurer, priority in bankruptcy when a private insurer is not").

14      HOWARD DELIVERY SERVICE, INC. *v.*
ZURICH AMERICAN INS. CO.

Opinion of the Court

continue coverage of a failing enterprise, thus promoting rehabilitation of the business. It may be doubted whether the projected incentive would outweigh competing financial pressure to pull the plug swiftly on an insolvent policy-holder, and thereby contain potential losses. An insurer undertakes to pay the scheduled benefits to workers injured on the job while the policy is in effect. In the case of serious injuries, however, benefits may remain payable years after termination of coverage. See 1 Larson & Larson §§10.02–10.03, at 10–3 to 10–7; Lencsis 51–52. While cancellation relieves the insurer from responsibility for future injuries, the insurer cannot escape the obligation to continue paying benefits for enduring maladies or disabilities, even though no premiums are paid by the former policyholder. An insurer would likely weigh in the balance the risk of incurring fresh obligations of long duration were it to continue insuring employers unable to pay currently for coverage. That consideration might well be controlling even with an assurance of priority status, for there is no guarantee that creditors accorded preferred positions will in fact be paid. See Tr. of Oral Arg. 31–32 ("[A]s soon as they smell bank-ruptcy, they're going to pull the plug anyway." (SCALIA, J.)); LeRoy, *supra*, at 596 (noting "general reluctance on the part of private insurers to provide debtors with the neces-sary Workers' Compensation coverage").

Rather than speculating on how workers' compensation insurers might react were they to be granted an (a)(5) priority, we are guided in reaching our decision by the equal distribution objective underlying the Bankruptcy Code, and the corollary principle that provisions allowing preferences must be tightly construed. See *Kothe,* 280 U. S., at 227 ("The broad purpose of the Bankruptcy Act is to bring about an equitable distribution of the bankrupt's estate . . . ."); *Nathanson,* 344 U. S., at 29 ("The theme of the Bankruptcy Act is 'equality of distribution', . . . and if one claimant is to be preferred over others, the purpose

should be clear from the statute." (quoting *Sampsell* v. *Imperial Paper & Color Corp.,* 313 U. S. 215, 219 (1941))); H. R. Rep., at 186; 2 Collier Bankruptcy Manual ¶507.01, p. 507–4 (rev. 3d ed. 2005) ("[P]riorities under the Code are to be narrowly construed.").

Every claim granted priority status reduces the funds available to general unsecured creditors and may diminish the recovery of other claimants qualifying for equal or lesser priorities. See *Joint Industry Bd.,* 391 U. S., at 228–229. "To give priority to a claimant not clearly entitled thereto is not only inconsistent with the policy of equality of distribution; it dilutes the value of the priority for those creditors Congress intended to prefer." *In re Mammoth Mart, Inc.*, 536 F. 2d 950, 953 (CA1 1976). Cases like Zurich's are illustrative. The Bankruptcy Code caps the amount recoverable for contributions to employee benefit plans. See *supra*, at 6–7. Opening the (a)(5) priority to workers' compensation carriers could shrink the amount available to cover unpaid contributions to plans paradigmatically qualifying as wage surrogates, prime among them, pension and health benefit plans.[9]

In sum, we find it far from clear that an employer's liability to provide workers' compensation coverage fits the §507(a)(5) category "contributions to an employee benefit plan . . . arising from services rendered." Weighing against such categorization, workers' compensation does not compensate employees for work performed, but instead, for on-the-job injuries incurred; workers' compensation regimes substitute not for wage payments, but for tort liability. Any doubt concerning the appropriate characterization, we conclude, is best resolved in accord with the Bankruptcy Code's equal distribution aim. We therefore reject the

---

[9] The dissenting opinion nowhere homes in on the reality that including amounts owed to workers' compensation carriers risks diminishing funds available to cover contributions to workers' pension and health care plans.

expanded interpretation Zurich invites. Unless and until Congress otherwise directs, we hold that carriers' claims for unpaid workers' compensation premiums remain outside the priority allowed by §507(a)(5).

*          *          *

For the reasons stated, the judgment of the United States Court of Appeals for the Fourth Circuit is reversed, and the case is remanded for further proceedings consistent with this opinion.

*It is so ordered.*

# SUPREME COURT OF THE UNITED STATES

No. 05–128

HOWARD DELIVERY SERVICE, INC., ET AL.,
PETITIONERS *v.* ZURICH AMERICAN
INSURANCE CO.

ON WRIT OF CERTIORARI TO THE UNITED STATES COURT OF
APPEALS FOR THE FOURTH CIRCUIT

[June 15, 2006]

JUSTICE KENNEDY, with whom JUSTICE SOUTER and JUSTICE ALITO join, dissenting.

The Court of Appeals for the Fourth Circuit held that payments for workers' compensation coverage are "contributions to an employee benefit plan . . . arising from services rendered." 11 U. S. C. A. §507(a)(5) (Supp. 2006). In reversing that judgment the Court's opinion relies on the premise that "statutorily prescribed workers' compensation regimes do not run exclusively to the employees' benefit." *Ante,* at 2. This rationale, however, does not suffice to justify the Court's holding. It does not accord, moreover, with the text or purpose of the bankruptcy priority defined in §507(a)(5). These are the main points of this respectful dissenting opinion.

I

Before commencing a more detailed discussion of the central issue, certain preliminary matters must be addressed. To begin with, the Court states a background rule of construction that, when we interpret the Bankruptcy Code, "provisions allowing preferences must be tightly construed." *Ante,* at 14. The Court links this rule with a general objective in the Code for equal distribution. *Ibid.* That objective, it is true, is acknowledged by our

precedents, and we have said that a Code provision must indicate a clear purpose to prefer one claim over another before a priority will be found. See *Nathanson* v. *NLRB,* 344 U. S. 25, 29 (1952). This is different, though, from establishing an interpretive principle of strict construction when the Code addresses priorities, for strict construction can be in tension with the objective of "equality of distribution for similar creditors." *Small Business Administration* v. *McClellan,* 364 U. S. 446, 452 (1960). The bankruptcy priorities, then, should not be read simply to give priorities to as few creditors as possible. They should be interpreted in accord with the principle of equal treatment of like claims. In any event the priority provisions should not be read so narrowly as to conflict with their plain meaning.

In accord with these principles the Court does not seem to dispute that the payments at issue here are "contributions" that "aris[e] from services rendered," §507(a)(5). There seems little doubt that both these statutory requirements are met. Petitioner Howard Delivery Service, Inc. (Howard), argues that a contribution must be voluntary; and it says that because the workers' compensation payments in this case are mandatory, they cannot be contributions. In some situations—for example, in discussing charitable contributions—it is possible to read "contributions" as Howard suggests. See Webster's Third New International Dictionary 496 (1971) (defining "contribution" as "a sum or thing voluntarily contributed"). In the context of employer payments, however, the voluntariness requirement does not accord with the usual meaning of the word. See *ibid.* (defining "contribution" alternatively as "a sum paid by an employer to an unemployment or group-insurance fund"). Many federal statutes and this Court's own cases expressly refer to "mandatory contributions" when discussing payments by employers and employees. See, *e.g.,* 26 U. S. C. §411(a)(3)(D); 29 U. S. C. §1053(a)(3)(D); §1054(c)(2)(C);

§1344; *Hughes Aircraft Co.* v. *Jacobson,* 525 U. S. 432, 435 (1999); *General Building Contractors Assn., Inc.* v. *Pennsylvania,* 458 U. S. 375, 394 (1982); *United States* v. *Lee,* 455 U. S. 252, 258 (1982). Even for pension and health benefit plans, which undeniably fall within the §507(a)(5) priority, the payments are rarely if ever voluntary in the charitable sense that Howard invokes. The mandatory nature of most workers' compensation coverage, then, fails to establish that the payments are not contributions.

Howard's argument that the workers' compensation payments here do not "aris[e] from services rendered," §507(a)(5), is also unpersuasive. This phrase, according to Howard, does not cover payments to insurance companies because those payments are made in exchange for the services of the insurance company, not the services of the employees. The Court seems to accept that insurance payments can receive the priority, see *ante,* at 5–6, 9, and this is part of the statute's necessary operation. Even if the payments may go to the insurance company, they are predicated nonetheless on the employees' performing services for the employer. They therefore "aris[e] from services rendered" in the same manner as do payments to a pension, health, or disability plan. From a practical standpoint, moreover, "[t]o allow the insurer to obtain its premiums through the priority would seem the surest way to provide the employees with the policy benefits to which they are entitled." *In re Saco Local Development Corp.*, 711 F. 2d 441, 449 (CA1 1983) (majority opinion by Breyer, J.).

## II

The question that remains—and my main point of disagreement with the Court—is whether workers' compensation insurance qualifies as an "employee benefit plan." The answer, one would think, depends on whether workers' compensation plans provide benefits to employees. It

is clear that they do, as the employer's contributions enable the insurer to give out substantial payments to employees.

Even assuming that the benefit the employer provides must be a net benefit, this condition is easily satisfied. It is true that, in return for receiving workers' compensation, employees give up some of the common-law tort remedies they otherwise could have pursued. See *ante,* at 9–11. The common-law remedies, though, typically required the employer to be at fault; and they were further limited by the defenses of contributory negligence, assumption of risk, and the fellow-servant doctrine. See 1 A. Larson & L. Larson, Workers' Compensation Law §2.03 (2005). As a result, only a small percentage of injured workers received any recovery. *Ibid.* Workers' compensation plans, even considering the tort claims relinquished, thus are generally a benefit to employees. See *id.,* §2.03, at 2–6 (noting the "helplessness which characterized the position of the injured worker of the precompensation era"). Even where an employee might have received greater damages in a tort suit, the greater speed and certainty of payment in workers' compensation is often worth the trade-off. In many States, moreover, the employee has a choice to opt out of the workers' compensation system, leaving him or her with traditional tort remedies. See, *e.g.,* Ariz. Rev. Stat. Ann. §23–906 (West 1995); Cal. Lab. Code Ann. §4154 (West 2003); Ky. Rev. Stat. Ann. §342.395 (West 2005); Mass. Gen. Laws, ch. 152, §24 (West 2005); N. D. Cent. Code Ann. §65–07.1–03 (Lexis 2003); Pa. Stat. Ann. Tit. 77, §1402(b) (Purdon 2002); R. I. Gen. Laws §28–29–17 (Supp. 2005). When the employee chooses workers' compensation, it plainly should be considered a benefit. For these reasons, workers' compensation plans, on the whole, are a benefit to employees; and indeed, the Court does not suggest otherwise.

Instead, the Court holds that workers' compensation is

not an "employee benefit plan" largely because it also benefits employers. *Ante,* at 10–11. The text of the statute does not refer to whether the plan benefits employers, nor would it make sense to do so. Since the goal of the priority is to protect the benefits of employees, there is little reason to suppose that employees should lose that protection based on the additional fact that employers may gain something as well. Employers rarely make large payments to employee funds out of altruism, and surely the Court should not hold that employee benefits provide no benefit to the employer. In the case of health benefits, for example, the employer may receive tax breaks, good will, a healthy work force, and the leverage to pay lower wages. Workers' compensation cannot be distinguished on this basis from pension, health, or disability plans, all of which the Court recognizes as covered by the priority.

The Court's three other bases for treating workers' compensation differently also find no support in the Bankruptcy Code. First, the Court maintains, based on the purpose and structure of the "employee benefit plan" priority in relation to the wage priority of §507(a)(4), that only wage substitutes are covered. *Ante,* at 5–7. Even assuming this proposition were correct, it would not lead to the Court's conclusion. That is because workers' compensation plans, as a matter of economic realities, are wage substitutes. The Court made this precise point in one of the first cases addressing a workers' compensation scheme: "[J]ust as the employee's assumption of ordinary risks at common law presumably was taken into account in fixing the rate of wages, so the fixed responsibility of the employer, and the modified assumption of risk by the employee under the new system, presumably will be reflected in the wage scale." *New York Central R. Co.* v. *White,* 243 U. S. 188, 201–202 (1917). Recent empirical studies confirm that employers pass on the cost of workers' compensation to employees in the form of lower wages. See

Fishback & Kantor, Did Workers Pay for the Passage of
Workers' Compensation Laws? 110 Quarterly Journal of
Econ. 713 (1995); Gruber & Krueger, The Incidence of
Mandated Employer-Provided Insurance: Lessons from
Workers' Compensation Insurance, 5 Tax Policy and the
Economy 111 (D. Bradford ed. 1991); Viscusi & Moore,
Workers' Compensation: Wage Effects, Benefit Inadequa-
cies, and the Value of Health Losses, 69 Review of Econ.
and Stats. 249 (1987).

   Second, the mandatory nature of most workers' compen-
sation plans does not change the applicability of the prior-
ity. The benefit to employees is real and significant re-
gardless of whether the government has mandated the
benefit. While States generally "prescribe and regulate"
workers' compensation and leave other benefits "to private
ordering," *ante,* at 12, the presence of bargaining has no
bearing on whether contributions should receive priority.
See *Saco,* 711 F. 2d, at 448–449. Indeed, it is difficult to
imagine that if States began to mandate other kinds of
benefits, those benefits would promptly fall outside
§507(a)(5). This would amount to saying that when-
ever some form of protection for employees comes to
be accepted as so necessary for their welfare that it is
mandated as an employer responsibility it is no longer a
benefit.

   While the Court says the general practice among the
States of making workers' compensation mandatory is just
one factor in the analysis, *ante,* at 12, presumably the
Court does not suggest that an optional workers' compen-
sation scheme is an "employee benefit plan" simply be-
cause other States have mandatory schemes. Assuming,
then, that a given optional workers' compensation scheme
might receive the priority, the Court's approach will create
uncertainty about application of the priority to the rele-
vant payments. Only a few States have wholly permissive
regimes, see, *e.g.,* Tex. Lab. Code Ann. §406.002 (West

2006), but many more offer exemptions for particular kinds of employers, see, *e.g.,* Tenn. Code Ann. §50–6–106(5) (2005); Mich. Comp. Laws §418.118(2) (1981). Not only will application of the priority depend on varying state laws, but also multistate workers' compensation plans may have to be segmented for purposes of determining bankruptcy priorities. There is nothing in §507(a)(5) to suggest an intent to cause this kind of disuniformity.

Third, the existence of state funds to compensate employees when their employers fail to provide workers' compensation benefits has little relevance. Once again, it is unclear how much weight the Court places on this factor, and it seems doubtful that the Court would remove health plans from the priority simply because a State created a fallback public health system. In any event state fallback funds do not change the fact that the employer is providing a benefit; a fallback fund simply indicates the employee could have received the benefit from somewhere else. Were it otherwise, pension plans would also fall outside the priority, since it appears they must provide benefits even if the employer has defaulted on its contributions. See *Central States, Southeast & Southwest Areas Pension Fund* v. *Central Transport, Inc.,* 472 U. S. 559, 567, n. 7 (1985) (citing Department of Labor advisory opinion). As a practical matter, moreover, most large multiemployer plans effectively guarantee compensation (unless all the employers happen to go bankrupt at the same time), and the Pension Benefit Guaranty Corporation ensures payment of at least some of the promised benefits. The exclusion of these plans from the priority, however, would accord with neither the text of the provision nor the common sense notion that protecting the insurer—whether it be a private company, a multiemployer plan, or a government fund—is the best way to protect the employees. See *Saco, supra*, at 449. Simply put, harm to the insurer will be passed along to the em-

ployees, either by rendering the insurer unable to pay or causing it to charge higher rates for the same coverage.

Finally, even if the language of §507(a)(5) were ambiguous, the definition of "employee benefit plan" in the Employee Retirement Income Security Act of 1974 (ERISA), 88 Stat. 829, as amended, 29 U. S. C. §1001 *et seq.* (2000 ed. and Supp. III), would lend considerable support to respondent's view. ERISA defines "employee benefit plan" as including an "employee welfare benefit plan," §1002(3), which in turn "mean[s] any plan, fund, or program which . . . was established or is maintained for the purpose of providing for its participants or their beneficiaries, through the purchase of insurance or otherwise, . . . benefits in the event of sickness, accident, disability, death or unemployment," §1002(1). The definition of a term in one statute does not necessarily control the interpretation of that term in another statute, for where the purposes or contexts are different the terms may take on different meanings. See *United States* v. *Reorganized CF&I Fabricators of Utah, Inc.,* 518 U. S. 213, 219–224 (1996). Where no conflicting purpose or context is apparent, though, other statutes may provide at least some evidence of Congress' understanding. See *Securities Industry Assn.* v. *Board of Governors, FRS,* 468 U. S. 137, 150–151 (1984); see also *ante,* at 9.

The ERISA definition is of particular relevance here given that "employee benefit plan" is not a generic phrase but something closer to a term of art, with a meaning that seems unlikely to change based on statutory context. Also, neither Howard nor the Court cites any source for a definition of "employee benefit plan" that would exclude workers' compensation. The Court attempts to minimize the significance of the ERISA definition by noting that ERISA exempts from its coverage any plan "maintained solely for the purpose of complying with applicable workmen's compensation laws." §1003(b)(3); see *ante,* at 9. Congress

exempted these plans from coverage, but it did not exclude them from its definition, and this is the relevant consideration. Indeed, the language of the exclusion confirms that workers' compensation is an employee benefit plan. See §1003(b) ("The provisions of this subchapter shall not apply to any employee benefit plan if . . . such plan is maintained solely for the purpose of complying with applicable workmen's compensation laws"). The exemption also belies the Court's position because it shows that mandatory workers' compensation plans were not included in the definition for any purpose particular to ERISA. Instead, since they were exempted from coverage, the most plausible reason for their inclusion (only to be then excluded) is that Congress was simply giving the ordinary definition of the term. There is no indication in §507(a)(5) that Congress chose to depart from that ordinary definition. By contrast, when Congress wanted a particular provision of the Bankruptcy Code to narrow the ordinary definition to exclude mandatory workers' compensation, it did so expressly by referring to those plans covered by ERISA. See 11 U. S. C. A. §541(b)(7) (Supp. 2006).

An "employee benefit plan," whether viewed as a term of art or in accordance with its plain meaning, includes workers' compensation. These are the reasons for my respectful dissent.